IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 7, 2006 Session

**STATE OF TENNESSEE v. KEVIN RUDD**

**Appeal from the Criminal Court for Shelby County**
**No. 04-07507    Chris Craft, Judge**

**No. W2005-02814-CCA-R3-CD  - Filed September 13, 2007**

The appellant, Kevin Rudd, was indicted for the first degree murder of his wife.  After a jury trial, the appellant was found guilty of first degree murder and sentenced to life in prison.  On appeal, the appellant argues: (1) the trial court improperly admitted propensity evidence in violation of Tennessee Rule of Evidence 404(b); (2) the trial court improperly denied a mistrial; and (3) the trial court improperly denied a motion in limine to exclude testimony that indicated the appellant engaged in shooting at other people.  Because we determine that the trial court improperly admitted evidence in violation of Tennessee Rule of Evidence 404(b), we reverse the judgment of the trial court and remand for a new trial.  The remaining issues are without merit.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Reversed and Remanded.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

William D. Massey and Lorna McClusky, Memphis, Tennessee, for the appellant, Kevin Rudd.

Paul G. Summers, Attorney General and Reporter; Brian Clay Johnson, Assistant Attorney General; and William L. Gibbons, District Attorney General; Robert Carter and Alonda Dwyer, Assistant District Attorney General,for the appellee, State of Tennessee.

**OPINION**

On November 2, 2004, the Shelby County Grand Jury indicted the appellant with first degree

murder for the shooting death of his wife, Traceye Rudd.

On April 23, 2004, the victim was at her residence in Memphis with her three children, Sedondra, Octavius and Nissa Ellis. Sedondra Ellis, who was fifteen at the time of the incident, testified that on the night of April 22, 2004, she went to bed at around ten o'clock. She was awakened around midnight by the sound of "my momma screaming [at the appellant], stop pulling my hair." Sedondra explained that she heard things get quiet, then heard her mother and the appellant "just talking." Then she heard some bumping noises and sounds coming from the direction of her mother's bedroom. She later heard her mother and the appellant talking in the living room of the residence about her mother's truck. According to Sedondra the victim refused to let the appellant use her truck. Sedondra heard the appellant ask the victim for a hug and kiss. Sedondra then described that it was quiet for about five minutes before she heard her mother say, "If you shoot me, I know where I'm going, but do you know where you're going[?]" Then Sedondra heard a gunshot. When she heard the shot, she ran to the living room where she saw the victim lying on the floor. Sedondra tried to call 911 from the telephone, but the cord had been ripped out of the wall. Sedondra was able to call 911 from the fax machine in the living room.

Octavius Ellis, who was ten years old at the time of the victim's death, also heard the appellant and the victim fighting that night. Octavius was awakened when he heard his mother scream at the appellant to "stop pulling [her] hair." Octavius got out of bed and walked down the hall to his mother's bedroom where he saw the appellant on top of the victim pinning her down. The appellant told Octavius to get his "ass out" of the room. The victim told Octavius to go back to bed. The victim then came to Octavius' room and told him that everything was going to be alright. Octavius noticed that the arm of the victim's shirt was ripped. The victim left Octavius' room.

-2-

Sometime later, Octavius also heard the appellant ask the victim for a hug. The victim refused. Octavius heard the appellant ask the victim for the keys to her truck and the victim again refused. Octavius, who was in his room with the door open, saw the appellant walk by and go into the victim's and the appellant's bedroom. Octavius heard a drawer open and a "clicking noise" and saw the appellant walk back down the hall with the back part of a gun sticking up out of his pants pocket.

Octavius heard the appellant walk into the living room and again ask the victim for a hug. Octavius heard the victim refuse, then heard silence before he heard the victim say, "If you shoot me, I know where I'm going, but do you know where you're going[?]" Octavius heard the victim say this three times. Then Octavius heard a gunshot. He ran out into the living room where he saw the victim lying on the floor with blood coming from her mouth and nose. There was also blood on the victim's shirt. Octavius ran outside and saw the appellant running away. Octavius threw rocks at the appellant as he was running away.

The victim's children attempted to resuscitate her using CPR with the guidance of the 911 operator. However, when emergency personnel arrived on the scene, the victim was pronounced dead. Crime scene investigators recovered a spent .9 millimeter shell casing in the living room. The gun was never recovered.

Teresa Allen Campbell, the Shelby County Medical Examiner, performed an autopsy on the victim and was able to establish that the victim suffered a gunshot wound to her left face that went

through the edge of her nose and into her skull. Dr. Campbell opined that the victim was shot from a distance of two to three feet.

On April 24, 2003, the appellant turned himself in at the Fugitive Squad Office of the Shelby County Sheriff's Department. At trial, the appellant testified that he had been out of work for about three months prior to the incident. Both the victim and the appellant had worked at Sharp Manufacturing. The victim continued to work and pay the bills while the appellant was out of work. The appellant explained that on the night of the incident, he arrived at his residence "late . . . around midnight." The appellant had been out drinking beer and admitted that he was intoxicated. When he got home that night, the appellant ate some chicken and took a bath before getting into bed with the victim. The victim asked him if he had "the money." The appellant told the victim he did not have the money and the two started arguing. The appellant claimed that the two kicked each other and started fighting for a few minutes before Octavius came into the room and turned the light on and saw the appellant on top of the victim, pinning her down. The appellant told Mr. Ellis to get his "ass" out of the room. The appellant testified that he then got some blankets and a pillow and left the bedroom to go sleep on the couch in the living room. According to the appellant, the victim then came into the living room and pointed a gun at him.

The appellant stated that the victim was pointing the gun at him and "hollering" at him to get out of the house. The appellant claimed that he was "scared" so he asked the victim for the keys to her truck. The victim told the appellant that he was not taking her truck. At that point, the appellant claimed that he asked the victim for a hug and kiss "because [he] was trying to ease up on her so [he]

could grab the gun." The appellant stated that he "got up on her and . . . grabbed the gun." The two "tussled" over the gun and the victim was saying something to the appellant when the gun fired. The appellant stated that his finger was not on the trigger of the gun and that it went off by itself, shooting the victim. The appellant claimed that he did not intentionally shoot the victim, but that the victim's death was her own fault. The appellant started running from the house and stopped to throw the gun into a trash can down the street. The appellant was unable to explain why he did not stay at the house and try to help save his wife.

At the conclusion of the proof, the jury found the appellant guilty of first degree murder. As a result, the appellant was sentenced to life in prison. On appeal, the appellant challenges several evidentiary rulings made by the trial court.

Analysis

First, the appellant contends that the trial court improperly allowed the State to introduce evidence during its case-in-chief that he had shot a woman in 1991 in Mississippi under circumstances similar to the instant case. Specifically, the appellant argues that the introduction of the 1991 killing encouraged the jury to convict him based on an "improper suggestion that [the appellant] had a bad character trait of shooting women with who[m] he had a romantic relationship." The appellant also argues that the evidence of the prior killing was propensity evidence, that the testimony was not relevant, that the evidence did not rebut the defense theory that the shooting was an accident, and that the rebuttal provision of Tennessee Rule of Evidence 404(b) was improperly

applied to admit the evidence. The State contends that the appellant's argument is without merit because the trial court properly admitted the testimony.

Prior to trial, the State filed a motion in the trial court to determine the admissibility of the appellant's involvement in the 1991 shooting death of Stephanie Truttle in Mississippi. The State argued that the evidence of the prior shooting was admissible to show premeditation and that the shooting alleged in the current indictment was not accidental. The trial court held a pretrial hearing in accordance with Tennessee Rule of Evidence 404(b) to determine the admissibility of the prior crime. At the hearing, the State called Julius Tate, a criminal investigator for the Coldwater, Mississippi Police Department to testify that he investigated the 1991 death of Stephanie Truttle. According to Officer Tate, Ms. Truttle died from a single gunshot wound to the head in the right cheek. The appellant was the prime suspect and, when interviewed, informed the police that he and Ms. Truttle had been arguing at her house. They left the house and went down the street where the argument continued. At some point during the argument, the appellant shot her in the head. The appellant later pled guilty to manslaughter. At the conclusion of the hearing, the trial court ruled that if the appellant raised the defense of accident or mistake at trial, the evidence of the prior shooting could be admitted after a jury-out hearing in accordance with Tennessee Rule of Evidence 404(b). The trial court concluded that the facts of the prior killing "would heighten [the appellant's] sense of awareness" and it would be less likely that he would have pointed a gun in the victim's face herein by accident. Specifically, the trial court issued an order holding that:

[T]he State alleges that the defendant shot the victim . . . and anticipates that the defense at trial will be that the firearm was discharged unintentionally. The State wished to put on proof of a prior 1991 manslaughter for which the defendant was convicted, to show absence of accident or mistake. After evidence presented at the hearing, this court finds that a material issue exists other than conduct conforming with a character trait of the defendant, that of rebuttal or absence of accident or mistake. However, unless this theory is in fact offered by the defense, the danger of unfair prejudice which attaches to this prior conviction or bad act would outweigh its probative value.

This court also finds that if the defense does offer a theory or defense of accident or mistake, that the probative value of the prior bad act on the defendant's culpable mental state, given the specific facts of both of these cases, is not outweighed by the danger of unfair prejudice.

It is therefore, ORDERED, ADJUDGED, and DECREED that the State is precluded from mentioning or offering proof of this prior bad act during jury selection, its opening statement, or its case in chief, until and unless it feels the defense has "opened the door" to this proof, and must then renew its request outside the presence of the jury and have an additional hearing on this matter. If this court finds that the defense or theory of accident or mistake has been fairly raised, and the requirements

and safeguards of Tenn. R. Evid. 403 and 404(b) have been met, the additional proof of this bad act and conviction would be allowed.

At trial, during opening statements, counsel for the appellant painted a picture of the scene for the jury in which the victim and the appellant were struggling for the gun when "[t]he gun exploded and it hit [the victim] in the face," and "the gun exploded as [the appellant] fell away from [the victim]." In light of these statements by defense counsel, the State renewed its motion to introduce the facts of the 1991 killing in order to rebut the defense theory of accident. The trial court determined that the evidence was admissible to negate an innocent, negligent, reckless, or heat of passion state of mind and that the probative value of the evidence was not outweighed by the danger of unfair prejudice. The State called Officer Tate who gave testimony about the 1991 killing. After the testimony, the trial court gave the jury a lengthy curative instruction, stating in part:

> We don't use - - if someone has done something before, we don't use that as proof that they did it again later.
>
> . . . .
>
> If from the proof you find that the defendant has committed a crime other than that for which he is on trial, you may not consider such evidence to prove his disposition to commit such a crime as that on trial.

This evidence if believed by you may only be considered by you for the limited purpose of determining whether it provides proof or lack of proof of the defendant's alleged mental state at the alleged time of the offense now on trial.

You may never under any circumstances use this evidence as proof that the defendant acted intentionally or with premeditation.

You may use this evidence in deciding whether or not the defendant acted knowingly with an awareness that his alleged conduct was reasonably certain to cause the death of the alleged victim.

You may use this evidence in deciding whether or not the defendant acted recklessly, aware of but consciously disregarding a substantial and unjustifiable risk that the alleged victim would be killed.

The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

You may use this evidence in deciding whether or not the defendant acted with criminal negligence. That he ought to have been aware of a substantial and unjustifiable risk that the alleged victim would be killed.

The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Again, if you find the defendant committed a crime other than that for which he is now on trial, you may not consider such evidence to prove his propensity or disposition to commit such a crime as that on trial or that the offense was intentional or premeditated.

Such evidence of another crime if considered by you for any purpose at all must not be considered for any purpose other than to decide the defendant's mental state at the time of the alleged shooting as specifically set out above.

As we begin our analysis, we note well-established precedent providing "that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." State v. McLeod, 937 S.W.2d 867, 871 (Tenn. 1996). Moreover, the Tennessee Rules of Evidence embody, and our courts traditionally have acknowledged, "a policy of liberality in the admission of evidence in both civil and criminal cases." State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); State v. Robinson, 930 S.W.2d 78, 84 (Tenn. Crim. App. 1995). To be admissible, evidence must satisfy the threshold determination of relevancy mandated by Tennessee Rule of Evidence 401. See, e.g., Banks, 564 S.W.2d at 949. Rule 401 defines "relevant

evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by . . . the danger of unfair prejudice." Tenn. R. Evid. 403; see also Banks, 564 S.W.2d at 951. A trial court abuses its discretion in regards to the admissibility of evidence only when it "applie[s] an incorrect legal standard, or reach[es] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

The general rule is that evidence of a defendant's prior conduct is inadmissible, especially when previous crimes or acts are of the same character as the charged offense, because such evidence is irrelevant and invites the "finder of fact to infer guilt from propensity." State v. Hallock, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). Tennessee Rule of Evidence 404(b) permits the admission of evidence of prior conduct if the evidence of other acts is relevant to a litigated issue such as identity, intent, or rebuttal of accident or mistake, and the probative value outweighs the danger of unfair prejudice. See Tenn. R. Evid. 404(b) Advisory Comm'n Comments; State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985); State v. Hooten, 735 S.W.2d 823, 824 (Tenn. Crim. App. 1987). However, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Before admitting evidence under rule 404(b), the rule provides that (1) upon request, the court must hold a hearing outside the jury's presence; (2) the court must determine that the evidence

is probative on a material issue and must, if requested, state on the record the material issue and the reasons for admitting or excluding the evidence; and (3) the court must exclude the evidence if the danger of unfair prejudice outweighs its probative value. Tenn. R. Evid. 404(b).

The rationale underlying Rule 404(b)'s exclusion of evidence of a defendant's prior bad acts is that admission of such evidence carries with it the inherent risk of the jury convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than the conviction resting upon the strength of the evidence. State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994). The risk is greater when the defendant's prior bad acts are similar to the crime for which the defendant is on trial. Id.; see also State v. McCary, 922 S.W.2d 511, 514-15 (Tenn. 1996).

We agree with the trial court that whether there was an accident or mistake with respect to the discharge of the firearm was a material, contested issue at trial, and therefore the appellant's prior conviction was relevant to a material issue other than to show action in conformity with a character trait. However, we recognize, as pointed out by the appellant that because opening statements by counsel are not evidence, such statements will not alone "open the door" for the prosecution to introduce evidence of other crimes because opening statements provide nothing for the State to rebut. State v. Boris Terrell Traylor, No. 01C01-9104-CC-00124, 1992 WL 14140, at *2-*3 (Tenn. Crim. App., at Nashville, January 31, 1992).

In Boris Terrell Traylor, the defendant was indicted for robbery, aggravated kidnapping and aggravated rape. During opening statements, defense counsel argued that the victim voluntarily got

into the defendant's car. Further, defense counsel argued that the defendant was the victim of false charges. In response to the opening statement, counsel for the State requested that it be allowed to offer proof of the defendant's prior convictions for kidnapping and assault with the intent to commit rape during its case-in-chief because the defense counsel raised consent and the defendant's intent as an issue. The trial court agreed and allowed the testimony during the State's case-in-chief. The defendant did not take the stand or present any proof. On appeal, this Court examined several cases from other jurisdictions and ultimately reversed and remanded the defendant's case for a new trial, concluding that

> opening statements are 'intended merely to inform the trial judge and jury, in a general way, of the nature of the case and to outline, generally the facts each party intends to prove. Such statements do not amount to stipulations and certainly are not a substitute for the pleadings of evidence.
>
> . . . .
>
> Since opening statements by counsel are not evidence, there was simply nothing for the state to rebut without the introduction of 'other crimes' evidence. Therefore, this amounted to the introduction of propensity or disposition evidence. . . . If the opening statement in this case would justify the introduction of 'other crimes' evidence, virtually no case would ever be tried without 'other crimes' evidence being presented in the prosecution's case-in-chief. Defense counsel almost always argues

-13-

that the victim or the witnesses are mistaken or untruthful and that the defendant is

the 'victim of false charges.'

Boris Terrell Traylor, 1992 WL 14140, at *3 (internal citations omitted).[1]

In State v. Copenny, 888 S.W.2d 450 (Tenn. Crim. App. 1993), the defendant was charged with first degree murder. After a trial, he was convicted of second degree murder. There were no witnesses to the shooting that claimed the life of the victim. During opening statements, the defense argued that the victim was the first aggressor. The State introduced the testimony of Lawanda Hughley at trial, who spent the weekend prior to the murder with the victim. Ms. Hughley testified that she and the victim were walking to their car that weekend when someone called the victim's name and fired shots at their car. Ms. Hughley stated that the victim was not carrying a gun at the time, nor had she ever known him to carry a gun before. Ms. Hughley explained that the victim purchased a gun after that incident. The defendant later introduced testimony about an incident that occurred four weeks prior to the shooting that indicated that the victim entered a lounge and confronted the appellant. According to the testimony of a witness, the victim brandished a gun, threatened the appellant and later attacked him. On appeal, the defendant argued that the trial court improperly admitted Ms. Hughley's testimony. The State argued that the testimony was admissible

---

[1] At least one other panel of this Court has concluded that a trial court erred in determining that defense counsel had "opened the door" to admission by the State of the appellant's prior conviction for failure to appear when defense counsel asserted in opening statements that he hoped to develop that the defendant was a "decent person," but, in that case, ultimately determined that the evidence was admissible due to the limited issue before the jury. State v. Nathan McKissack, No. 01C01-9804-CC-00190, 1999 WL 77846, at *7 (Tenn. Crim. App., at Nashville, Feb. 19, 1999), perm. app. denied concurring in results only (Tenn. Oct. 4, 1999). However, the Tennessee Supreme Court denied permission to appeal in this case and stated that they concurred in the results only. Consequently, the holding of Nathan McKissack is limited to the peculiar facts of that case and inapplicable to the case herein.

to rebut the defense theory that the victim was the first aggressor. This Court determined that the testimony of Ms. Hughley was improperly admitted under Tennessee Rule of Evidence 404(a)(2)[2] to rebut evidence that the victim was the first aggressor at the time it was admitted, as the defendant had yet to proffer any evidence that the victim was the first aggressor. However, this Court concluded that the admission of the evidence was harmless because it contained no specific reference to the appellant as the person firing the shots and the evidence would have come in after the defendant raised the issue of self-defense during his testimony. Id. at 455. We determine that Copenny is distinguishable as it deals with the character of the victim under Tennessee Rule of Evidence 404(a)(2), rather than the introduction of prior bad acts of the defendant under Tennessee Rule of Evidence 404(b). Not only was there no specific reference to the defendant, this latter type of evidence especially when it involves a crime similar to the one at bar carries with it a heightened potential for unfair prejudice.

In the case herein, we conclude that the admission of the testimony of Officer Tate was improper. The evidence was admitted during the State's case-in-chief in response to defense counsel's assertion during opening statements that the gun "exploded" while the appellant and the victim were arguing. The opening statement of defense counsel was not evidence, so at the time the testimony of Officer Tate was admitted, there was no evidence of accident or mistake to rebut, as is the requirement for admission of prior bad acts under Tennessee Rule of Evidence 404(b).

---

[2]Tennessee Rule of Evidence 404(a)(2) governs the introduction of evidence regarding the character of the victim and provides that while not generally admissible for the purpose of proving action in conformity with the character or trait on a particular occasion, "[e]vidence of a pertinent character trait of the victim of crime offered by an accused or by the prosecution [is admissible] to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor [is admissible]."

Consequently, it was error for the trial court to admit the testimony of Officer Tate during the State's case-in-chief. Moreover, although the appellant later testified that the killing was accidental, we find that the error was not harmless. Prior crimes evidence such as that involved in this case carries with it such a high potential for undue prejudice that, in our opinion, the admission of such evidence must be in strict compliance with the standards set forth in Rule 404(b) and the decisions of the appellate courts. This is especially true in cases where the prior bad act or crime is essentially the only proof used to rebut the defense such as accident or mistake. Consequently, we must reverse the appellant's conviction and remand for a new trial. On remand, if the State seeks to introduce the testimony of Officer Tate and the evidence of the appellant's prior crime <u>after</u> the appellant introduces evidence that the shooting was an accident, the trial court should then determine whether the evidence is admissible under Tennessee Rule of Evidence 404(b) to rebut the theory of accident, keeping in mind the remoteness in time of the Mississippi conviction and the high potential for undue prejudice due to the similarities between the Mississippi incident and the proof in the instant case.

Although unnecessary to the disposition of this appeal, we will address the remaining issues in the event of further appeal to the Supreme Court of Tennessee.

<u>Denial of Mistrial</u>

The appellant argues that the trial court improperly denied his motion for a mistrial after the testimony of Officer Tate wherein counsel for the State referred to the 1991 death of Stephanie Truttle as a "murder." Specifically, the appellant argues that the improper statement by the

prosecutor was prejudicial and affected the verdict. The State argues that the trial court properly

denied the motion for mistrial because the State did not intentionally use the word murder, the jury

was instructed that statements of counsel are not evidence, and the trial court immediately gave the

jury a curative instruction.

At trial, the following exchange occurred between the prosecutor and witness Officer Tate.

PROSECUTOR: While on the Coldwater Police Department, did you come to investigate the murder of a Stephanie Truttle?

WITNESS: Yes, I did.

DEFENSE COUNSEL: Your honor, I object.

THE COURT: All right. Would you all approach the bench for a second?

PROSECUTOR: I'm sorry. I'll rephrase that. I meant to say homicide.

THE COURT: No. We need to say the [word] death. Okay?

DEFENSE COUNSEL: I'll ask to the Court to instruct the jury to disregard that statement of counsel.

Immediately thereafter, the trial court instructed the jury as follows:

I've already told you that questions of attorneys are not proof. [The prosecutor] used the word murder which was an improper word. We're going to use the word death of this other person instead. In no way should you assume that this person was

-17-

murdered. Does everybody understand that? This person died if there is proof to that affect.

At the conclusion of Officer Tate's testimony, defense counsel renewed their motion for a mistrial on the basis of the prosecutor's use of the word "murder." Defense counsel argued that the statement "put murder in [the juror's] mind[s]" even though the trial court gave a curative instruction. The trial court determined that the curative instruction was satisfactory and denied the motion for mistrial. On appeal, the appellant argues that the curative instruction was "wholly ineffective" and that the conduct of the prosecutor was "analogous to improper prosecutorial argument to the jury."

The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred which would preclude an impartial verdict. See Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). The decision whether to grant a mistrial is within the trial court's discretion and will not be disturbed absent an abuse of that discretion. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). For this reason, an appellate court's review should provide considerable deference to the trial court's ruling in determining whether an occurrence or event at trial has so prejudiced the defendant or the State as to preclude a fair and impartial verdict. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

Factors which must be considered in determining whether improper prosecutorial conduct affected the jury verdict to the prejudice of the defendant are (1) the conduct complained of viewed

in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the Court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and, (5) the relative strength or weakness of the case. Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

Looking to the factors and applying them to the case herein, it is clear that the prosecutor should not have used the word murder to describe the 1991 death during the questioning of Officer Tate, especially when the appellant was on trial for a crime with similar facts. However, the trial court immediately undertook to instruct the jury that they were not to consider the word murder in the context of the 1991 death. Further, the prosecutor immediately recognized her mistake and from that point forward referred the "death" of Stephanie Truttle in 1991. The record before us does not support a conclusion that a miscarriage of justice occurred by continuing the trial after the prosecutor's improper reference to the death as a murder. See State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). Again, the decision to grant a mistrial is within the sound discretion of the trial court. No clear abuse of discretion appears on the face of the record, and, therefore, we will not disturb the trial court's decision to deny the appellant's motion for a mistrial. Id.

Denial of Motion in Limine

Lastly, the appellant contends that the trial court improperly denied his motion in limine to exclude testimony by Octavius Ellis that he had seen the appellant shoot at people before.

Specifically, the appellant argues that the testimony constituted evidence of a prior bad act and again was prohibited by Tennessee Rule of Evidence 404(b) because it was not relevant to a material issue in the case "other than propensity of the defendant to commit bad acts." The State disagrees, arguing that any error is attributed to the appellant because defense counsel elicited the testimony in question.

Prior to trial, the trial court stated that Octavius Ellis could testify that the appellant had a gun, if based on personal knowledge, but not that he saw the appellant shooting at other people. However, the trial court ultimately ruled that it was not going to grant the motion in limine to prohibit the testimony of Octavius Ellis regarding the appellant's ownership of a gun. At trial, during the cross-examination of Octavius Ellis, the following exchange occurred between defense counsel and Octavius Ellis.

> DEFENSE COUNSEL: Octavius, I want to talk to you about this gun. You didn't know where this gun was kept?
>
> WITNESS: No, sir.
>
> DEFENSE COUNSEL: Did you ever see the gun before?
>
> WITNESS: Yes, sir. I saw it when he [the appellant] was shooting at somebody.
>
> DEFENSE COUNSEL: I'm sorry, I can't hear you?
>
> WITNESS: When he [the appellant] was shooting at somebody.
>
> THE COURT: When he [the appellant] was shooting at somebody.
>
> DEFENSE COUNSEL: Okay. You had seen this gun before at another time?
>
> WITNESS: Yes, sir.

Thus, defense counsel elicited the testimony from the witness.

From looking at the record, it is obvious that the State did not elicit the testimony herein. The testimony was elicited by defense counsel on cross-examination of the witness. Consequently, any error regarding the testimony is attributed to the defendant. See Tenn. R. App. P. 36(a). This issue is without merit.

## Conclusion

For the foregoing reasons, the judgment of the trial court is reversed and remanded for a new trial.

_____
JERRY L. SMITH, JUDGE